MR. DINZER, IT WOULD BE HELPFUL TO ALL OF US IF YOU WOULD CONCENTRATE ON THE DIFFERENCES FROM THE PRIOR CASE. WE DON'T NEED TO REPEAT THE ARGUMENTS WE'VE EXHAUSTED. I WOULD LIKE TO START WITH THREE DIFFERENCES, THREE DISTINCTIONS BETWEEN THE NECLONIAL ANALYSIS. ONE OF THE ALLEGATIONS NECLONIAL RAISED WAS THAT GM AND CHRYSLER PLANNED TO TERMINATE THESE DEALERSHIPS ALREADY, AND THAT THE GOVERNMENT REQUIRED THE AUTOMAKERS, IN THEIR WORDS, TO ACCELERATE, AND THAT'S AT THE JOINT APPENDIX 29 AND 30, AND THAT THE LOAN CONDITION ACCELERATED THEIR DEALER TERMINATION TIMETABLES. SO THAT'S THE FIRST THING. THE SECOND ONE IS THAT COLONIAL ALLEGES MISCONDUCT IN THE BANKRUPTCY COURT PROCEEDINGS, AND FINALLY, COLONIAL ASSERTS JUDICIAL TAKINGS CLAIM. AND WITH THAT, WHAT I'D LIKE TO DO IS I'D LIKE TO START WITH THE CASE OF OMNIUM, WHICH IS CONTROLLED HERE, AND WHICH GOES DIRECTLY TO THE PLAINTIFF. THE PLAINTIFF ALLEGES THAT THE UNITED STATES TOOK CONTRACT RIGHTS, TOOK THE CONTRACT RIGHTS. AND WHAT THE OMNIUM DECISION HAS SAID, AND WHAT THIS COURT HAS SAID, IS THAT THE PLAINTIFF NEEDS AN ALLEGATION THAT THE GOVERNMENT ASSUMED THE CONTRACT. IF YOU'RE SAYING THAT THE GOVERNMENT TOOK YOUR CONTRACT, THAT THE GOVERNMENT STEPPED INTO YOUR SHOES AND TOOK OVER YOUR CONTRACT AND EXERCISED IT AS IN YOUR PLAINS. So suppose I thought that Omnia actually leaves a whole lot more un-clarified than clarified. It said, what we have there was not an action specifically targeted at a contract at all, so in the absence of that, we don't need to think about whether if it were in some way targeted to the contract, which kinds of actions targeted to the contract would be enough, because it doesn't address that. Your Honor, if I could, the Omnium is actually as targeted as you could get, because what happened in Omnia is this, you had a steel producer who had a deal with a contract with Omnium that they would provide steel, and the United States came in and they told that steel producer two things. They said, first, you'll give us the steel, and second, you will not comply with your contract with Omnium, you will not send them the steel. So you really couldn't get it any more targeted, Your Honor, than that, and what the court said is frustration and appropriation are essentially different things. The fact that this happened in a frustrated juror contract, that is something, but it is not a taking, and it is not compensable under the Fifth Amendment taking law, and so you really couldn't get any more targeted than that, and this court has picked up the 7673rd, and Palmyra, and Hundley, where the court said point blank, you need an allegation that the government stepped into your shoes, and that's what brings this motion to dismiss. They don't have that allegation. Their allegation is the government did something that frustrated, that destroyed, that did something, but nowhere did they say the government showed up at their dealerships, started taking cars, started fixing cars, which is exactly what would be required under Omnium. Of course, Omnium may be helpful to you in the ways that you say, but it also sort of scuttles your point about the contract not being property, since Omnium specifically said that the contracts were property. Your Honor, we don't dispute that contracts are property. I mean, that's not part of our case. Certain contract rights can be property. What we've said with respect to the property interest is that even if you have a contract that may be property for some things, you don't have the property interest of having it protected in bankruptcy, that it doesn't get rejected in bankruptcy. That's all we've said with respect to the property rights, Your Honor, and that if their claim, which the Colonial's claim is, as well as Ali's, is that our contract was rejected, in fact, the Colonial's claim is not only that the contract was rejected, but there was malfeasance, but that our claim was rejected in bankruptcy, that there has to be a right associated with that, and that they don't have that property right. Would that be, I just need to, I think, understand this better. If the government actually exercised not a monetary inducement authority, but a compulsive, you know, a compulsion authority, and directed either first new GM and then old GM, depending on which of the two rejections is at issue, and said, you are hereby directed, statutory authority or something, to make the choice that is allowed under either 365 or 363, would you still say they had no property interest because that choice was always part of the background of bankruptcy law? Just so I understand, Your Honor, it's hypothetical. You are directed to make the choice of, let's focus just on 363. No, it's 365, I'm sorry. So there's no new one on 365. 365 has always said executory contracts can be assumed or not, and the debtor in possession can reject them with the permission of the bankruptcy court and so on, and the government orders the debtor in possession, I mean here, old GMs, you must exercise the authority that not assume or to cancel whatever the right term is under 365, the contract. Then, Your Honor, GM might have a claim, because we've used our government sovereign authority to do something to GM. GM might have a claim against the United States if they could demonstrate some sort of harm or malign. But the dealers would still, for two reasons, one is that there's no direct action against them, but also what's happening to their... One of the things that's so difficult here is that one keeps bouncing around between property interest, nature of the government action. I was just focusing on the property. Okay, and I apologize, Your Honor. No. Do they have a property interest in not having the debtor in possession exercise this background bankruptcy authority under compulsion from the government? No, they do not. But they might have an interest in bankruptcy law in having the court not allow it to happen because the government is acting as a puppeteer behind the scenes. They may have something to say in bankruptcy law, and the court may have some action to take. But no. The plaintiffs cite Palazzolo, and they cite other cases, but basically the background principles don't change. So they never had the right, if their contract was canceled in bankruptcy, they never had the right to challenge that. And the fact that it might have happened at the control of the government, they might have had a claim to stop it, and they might even have some challenge to GM for allowing it to happen. I don't believe so. But they certainly wouldn't have a taking the claim because they never had that property. But if there's this background of law that creates a range of possible choices that could affect a contract, for example, or some other property interest, and if the government now, let's assume they use some sort of compulsion, causes choice number one as opposed to choice number two, and choice number one is the one that eliminates their property, they really don't have a property interest? No, Your Honor. What they do have is they have the right to go into bankruptcy court and say, we don't think this is the way this is supposed to happen, bankruptcy court. Make it not happen. And then maybe they're right, and then the bankruptcy court says, well, we've got a problem here, there's government control, there's this, and so I won't let it happen. That's their remedy. And then if they don't like that, they can take it to the district court in the Second Circuit. But their rights on the contract don't expand or compress, depending on what the government action is. When they sign these agreements, they knew or should have known that if their counterparty went bankrupt, they might end up in bankruptcy court, and in bankruptcy court, they might suffer the rejection of their contract. They never had that stick in their bundle, Your Honor, and the government actions could not give them that stick back. Well, I guess what you're saying, and I think there's a semantic problem here because you keep presenting this as a property rights question, which I'm not sure it is. What you're really saying is that if a private lender could come into bankruptcy and do this, there is a result of the actions taken by the bankruptcy court and taken under the statute of 365. And you're saying the government ought to be able to do the same thing. And the question is, is the government doing the same thing, or is it doing something different? And what this court has said is, and that's the sovereign proprietary distinction, what this court has said is that there's no taking if the government is acting in a proprietary fashion. I have a difficult time seeing that this is a proprietary thing. The government wasn't doing this to make money. It was doing this to vindicate a sovereign interest in saving jobs and continuing these companies. It wasn't strictly making an investment to make money. Now, it may have had an interest in protecting its investment if it was going to loan the Respectfully, Your Honor, if you look at the government's motives, as I said previously, the government is always acting in the public interest. So that can't be the motive that we look at to go between sovereign and proprietary. What case law has said is that if it's analogous to private conduct, that that's proprietary. But the real hammer here is this. Is the government operating under its sovereign authority to pass statutes, pass regulations, or force? If it's not, if it's in something that's more analogous to a private actor making a loan, buying a hammer, whatever those other things are, then it can't be a taking. There could be contract claiming and the like. So we'd ask the court, basically, if the Warren Buffett law, if Warren Buffett could get people together to have done this, which plaintiffs say that he couldn't, but they don't allege any reason why he couldn't. But what do you say, then, is the government's motives? Your Honor, the plaintiffs have alleged that the government's motives were to save the auto industry. I didn't ask what they alleged. You say that we can look at the government's motives, or we must look at the government's motives? No, Your Honor. Or that they're irrelevant? I say the opposite, Your Honor. I say that the government's motives are irrelevant. But the motive must be the public interest. It's the only basis for a government action. For any government action, yes, Your Honor. So that's why it becomes irrelevant. That's why we look at the government's actions. You see, I think I just heard you contradict yourself. Either it's in the public interest or it's not. I apologize if I've misspoken, Your Honor, but what I'm trying to say, if I've done it incorrectly, I apologize, is that we don't, in making the sovereign proprietary distinction, we do not look at the government's motives, intent, objectives. We look at the conduct, directly at the conduct, and see, does it fall within the sovereign bucket, or does it fall within something that's more analogous to private conduct? And if it does, that can't be a take. And here plaintiffs don't allege the sovereign conduct necessary when they allege that it's a loan. Very briefly, there is no judicial taking here. This court's never found one. A judicial taking is based, presumably, on the court's conduct or misconduct, which is what the plaintiffs are suggesting. This court cannot and does not sit in review of a bankruptcy court. Can I ask you a question before you sit down? I realize, because the record here is infinitesimally small, that the answer, if there is one, has to come from somewhere else. When New GM made the choice not to purchase these dealer agreements, which was the first of the two rejections that led to the termination of them, did the government have its 60% equity interest, and if so, did it also have some kind of actual control of management decision making in the New GM? There were two steps, Your Honor. There was the sale and assumption of the existing assets, including the existing contract, and then there was the rejection. The rejection took place of the old dealers. The rejection took place by old GM and old Chrysler. Right. That's what I mean. That's why the first step was New GM had to say, we want this, we don't want them. And then the them then remains with old GM, and old GM says, I forget which, one of the bankruptcy judges said, well, of course, the old company has a perfect interest in not continuing these contracts. They don't make cars anymore. Right. Why do we need dealers? So the real decision was the new company's decision not to purchase these. Just focusing on GM, New GM was 60% owned in equity by the United States. I believe ultimately, yes, it was. And did the United States at that point have essentially, loosely speaking, managerial control, or not even loosely speaking, as 60% equity owned? I don't know your audit control structure, so I don't have an answer for you on that. I can look at it. I'm happy to follow. I can't give you a good answer. Thank you, Mr. Jensen. Mr. Zanville. It's a real honor for me to be here in the most extraordinary case I've ever seen. I've only been practicing 40 years, but this is truly the most extraordinary case I've ever seen. I want to try to organize my comments based on the questions that I've heard to be responsive to your inquiries, but I would like to start out by noting that this is not the first time we've heard the government take the position that as a matter of law, free will applies, and that people who are given an offer they can't refuse actually can refuse. We've all heard the expression, it's an offer you can't refuse, and what we understand that to mean is that nobody understands that their offers can never be turned out. That's the nature of an offer you can't refuse. And in this case, these were offers that couldn't be refused. The Supreme Court last term in the Affordable Care Act, the Sebelius case, addressed the question of the government's position and said, no, no, theoretical voluntariliness is not enough. The Supreme Court said that argument ignores reality, and I really appreciate the government saying in its opening statements, what we're left here is the real world, and that's the real world that we've addressed in our complaint. In the real world, what happened, in response to Judge Tarana's question, prior to the GM viability study being introduced, the government forced out the CEO and the Board of Directors of General Motors. They were accessing control before the viability study was submitted. The control of the government... George Bush loans prior to the Obama administration coming in, those were original bridge loans, and there was obviously the economy was in a shambles and people were scrambling to say what they could say to make the best decisions they could make, so enormous amounts of money was pumped in to the auto companies to try to stabilize things so people could come up with a plan. Do you contend that if there had been no government loan here, no government intervention, that it would have been a taking if GM had done this on its own? Well, a private entity, by its own, without government encouragement or solicitation, can't conduct... No, using the bankruptcy process. Using the bankruptcy process to eliminate the contracts is not a taking. Well, if the question you're asking, I think it relates to the judicial takings issue you're asking below, that actually was raised in sort of my law professor sense... Would that be a taking? No. Okay. So, to go to the question of, first of all, the overall view of the government's position as well, if there's no regulation that forced this outcome, if there's no statute that forced this outcome, therefore it can't be, I guess, a taking or a Penn Central taking, but that's not the law. As recently as last term in Arkansas Game and Fish, Justice Ginsburg wrote that we recognize there's no magic formula that enables the court to judge in every case whether a given governmental interference with property is a taking. In view of the nearly infinite variety of ways that government actions or regulations can affect property interests, the court has recognized a few invariable rules. The government's response to our case has been to try to force us into a rigid set of those kind of rules, but Penn Central doesn't countenance that. Arkansas Game and Fish, last term, doesn't countenance that and says, as this court knows, every one of these cases is to be determined on their own facts. What about the hypothetical that I asked in the first case, and that is that let's assume that these dealerships would have no value in liquidation and that the only alternative to a government bailout was liquidation. If that were the case, would there be a taking here? Well, I have to assume the truth of your hypothetical, and I want to be responsive to you. I think, given the narrow limits of that hypothetical, I think it's probably not a taking, but that's not the reality of this case. The reality of this case is that we live in a too-big-to-fail environment. In 1970, Price was bailed out. Now, that was actually a true lull, but in this scenario, there was not one person in the United States that believed that General Motors was going to be allowed to fail. That's why... That sounds as though you're saying that if the government decided to intervene, it had to intervene in some way that was fair to the parties involved and because they were unfair, that there was a taking. I don't think it relates to fairness, Your Honor, with all due respect. I think that the issue is, when you're in a too-big-to-fail environment under Penn Central, the real question is, why aren't other lenders stepping up to act? And the nature of too-big-to-fail is other lenders don't step up to act because they can't compete with... You agree that there was no possibility of other lenders coming in here, right? Well, we know at some point during the Chrysler process, a lender stepped up at the request of Chrysler to contribute some money, to make an offer, and the government went ballistic and rebelled against it. The government was upset that another lender was trying to get a piece of the pie. It's not in the complaint, but we live in some ways in this sort of peculiar world of twombly... I thought your argument you were just making is that the only way they could be saved was through a government bailout and that everybody knew that. That is my argument. The question I was trying to respond to is the question you were asking, well, was there no other lender that could step up? At least that's what I understood you to be asking. There was at least one other lender in an incrementally smaller size that did try to step up, and the government shooed them away. So the reality is, is that in this case... But why, if the thing would have gone to liquidation, absent the government intervention, and the dealerships would have been valueless under those circumstances, why is it a taking for the government to come in and say, we'll save you, but we want certain conditions to be satisfied? Well, first of all, assuming the fact, which is a fact question that will certainly be that dealerships were not going to have to make the choice, is there a value or no value. All they would do is wait. They would simply wait for the process, just like in 1970, to resurrect themselves. Business would go on, and as today, these dealerships have substantial value. There was no reason for any of these dealerships to believe that the government would step in, using its power, and say, well, 25% of you are going to lose your dealership rights, your exclusive rights to sell and service cars. We're going to give them to somebody else, for free. There was no expectation, at any level, of any dealer that that could happen. So... Are the plaintiffs here dealers that are no longer dealers, or did... I guess I just want you to explain to me what, if any effect, the statutory arbitration process had on this, and I got a little confused about some of the numbers, about how 99% of the dealers took GM's deal. Are all of your clients here out of business? All of our clients, all of our name plaintiffs are out of the business of having exclusive franchise to sell and service cars. There is certainly the potential, later, because we've asked for class status, that we would have some clients who would have temporary takings, at least possible, but we don't have any name plaintiffs who are in that position. What were the dealers given by GM? It varied. In some cases, certainly that's not part of the record, but in some cases, General Motors bought back some inventory. I don't believe that General Motors bought back specialized tooling, but I might be wrong about that. In no case that I know of was any blue sky real value for a dealership paid by General Motors. Let me see if I can focus on what we're here to decide today, which is entirely and solely whether, if the Court of Federal Claims proceeds as it thought that it might, to develop facts because it wasn't prepared, felt that it didn't know enough, to say this may be a taking or it may not be a taking, or this is or is not, and then to proceed. What additional evidence at the complaint or pleadings or whatever else would be required to bring this into the posture of a taking to satisfy this threshold, then proceeding with the trial and all the rest of it? Judge Hyde has conducted himself in an extraordinary fashion. He gave us, frankly, unlimited time to argue the case in front of him. His concern, as evidenced by all the arguments and colloquy that we had, was not that we were failing to establish the primal fascia elements of Penn Central, but that he was concerned about what to call it. He and I had a very frank and somewhat humorous exchange about my indifference to what we called it. Well, in that court, if you can't call it a taking, you're probably in the wrong court. I agree. We were discussing the question about whether it was a Penn Central taking, a Lucas taking. We were discussing it as a regulation by deal, a term that was coined by Professor Sering and Davidoff, which is that the government act here, under the Emergency Economic Stabilization Act and their five-paragraph policy statement, they had been clothed with authority by the Congress to act with discretion, and they conducted themselves by deal-making. They brought in the auto task force, who were Wall Street deal-makers, to do a deal. When these people looked at the facts of the situation, they said, oh, well, we want to have the Toyota model of dealerships. That's what we're going to impose as one of the big conditions of making loans. And so one of the fact questions that we have to deal with when we try this case, Your Honor, is going to be, was in fact that a condition imposed by the auto task force and the treasuries a condition to doing this deal? And was that decision made prior to the time of the bankruptcy? We believe the facts are yes. We believe we pled it that way. We believe that decision-making by the government put in action an irreversible course that was followed. Because, frankly, according to the SIGTARP report, General Motors and Chrysler both told SIGTARP doing this sort of action against the dealerships was not in our best interest. They could have heard us. They were actually against it. So given that, it's a little incongruous to believe that that was a voluntary act on behalf of the auto manufacturers. They agreed because it was a deal they couldn't refuse. You know, it was interesting to hear Ms. Benson talk about. Also, one of the questions is whether they would have done it anyway, terminated the dealer. In part, I want to make sure I'm responsive to your question. There was a quote made by Mr. Densler to our complaint that talked about accelerated dealer closures. We never suggested that General Motors or Chrysler in the acceleration of dealer closures would in any way not pay our dealers that they were able to get permission to close them down and terminate them. There's performance standards. I want to make sure I can try to respond to your question, Judge Newman, which is what would we have to prove at the trial court? Well, we'd have to prove it's property. We'd have to prove that the government actually forced General Motors and Chrysler or induced General Motors and Chrysler to act in this way. But also, we also could show alternatively that they simply had an agreement to act. It didn't have to be forced. They simply agreed that it was all in their best interest to do this, to defrock us of our property and take our property without paying. But the government itself, although it says now had no value, they assessed it as being worth $2.25 billion. So this property had some significant value. The government made a conscious decision. It did not want to pay for it. That was the whole scheme that was involved here, to sit down with Chrysler and General Motors and say, we're going to work together to create a 363 bankruptcy and we're going to find a way to not pay these people for the value of their dealerships. There was no one assumed, even at that moment, that these dealerships were valueless. The assumption was the dealerships were valuable. And the question the government was asking was only one question. How do we make sure we don't pay them? The government described it as a waste of taxpayer money to pay that $2.25 billion. They didn't say it would be a waste of General Motors money. They didn't say it was a waste of Chrysler money. They said it would be a waste of taxpayer money. So that is a pretty sanguine view of the facts we believe we would show at trial to demonstrate that our property... Do you agree that the government motive is irrelevant? I think the government motive is only relevant in the sense of Penn Central's element of the character of the government action. I'm never sure even what my law professor had on it. I fully understand some concepts as how they're going to develop, but I believe that the motive of the government can have some impact on the character of the government action. Not to invalidate the government action, not to impugn it as being some nefarious plan, but I do think it has some impact on that element. So when we go to trial in this case, we're going to demonstrate that this was a government plan. The government plan was formulated, put into the course of action, that General Motors and Chrysler were in no position to disagree, but frankly, had they done it voluntarily, probably as a matter of law, it wouldn't have made any difference. What happened was, is our property was taken. Can I just ask you, are there any factual findings of either of the two bankruptcy courts that you either do dispute, or that you think your case depends on disputing? I believe our case is completely independent from what the bankruptcy court did. What it did, that wasn't quite my question. And also it wasn't. It's a question about factual findings, one about liquidation being the only alternative, at least making that finding in, what is it, May or June of 2009, about whether there was any other lender, at least in May or June of 2009. I guess my question is, does your case either depend on disputing those findings, or do you, in fact, dispute as an alternative ground or something for your complaint? With regard to the first question, nothing about what the bankruptcy court did affects what we're doing in the Takings case, in my view. Our case is completely independent of that because the decisions that were made regarding disposition of our property were made prior to bankruptcy. All the rest of it was window dressing. It's sort of like the analogy, I guess, would be, once you've decided you're going to execute Joe Blow or Mary Doe, it really doesn't matter what the hangman does or the firing squad does. That decision's already been made. Well, let's take some of the findings. The one that Judge Toronto mentioned, that absent the government investment, that there would have been a liquidation. Is that something you dispute? We start from the proposition that there would not have been a liquidation. We start from the proposition that there would not have been a liquidation. So you do dispute it? Well, that was the second part, I guess, of Judge Toronto's question, which is we do dispute the finding to the extent it was made by the bankruptcy court. It was a contextual finding. But the question was not being asked by the bankruptcy court, why aren't there other lenders? The bankruptcy court was not dealing with the issue of too big to fail. The bankruptcy court, frankly, if you look at the decision, was driven by fear. The bankruptcy court, the General Motors judge specifically said... Well, you know, we sort of have enough of a motive floating around this case. I don't think we need that. And it may well be that the bankruptcy court's particular decisions that it had to make were constrained by time and the record and so on. Nevertheless, there is a question. Do you dispute that liquidation is what would have happened in the absence of a government loan? Yes, and the reason for that is because we believe that the facts will show that the government had already decided that both General Motors and Chrysler were too big to fail. That's not the same thing. I mean, what you're saying is the government would have stepped in. The question is, if the government did not step in, if it made the decision which you say it would not have made, would liquidation necessarily have followed? Well, I guess that's sort of asking the question, if a person needs life support to breathe and you withdraw the life support, are they going to die? I suppose the question is, would any other lender have stepped up if the government had said, we're not going to be a lender no matter what, take our word for it. We're never going to do this. I suppose that you can get to that as an abstract idea. That's not the reality of our case. Right, but the question is, is that where you contend? You adverted to that possibility before, that it was only the government's essentially indisputable, we won't walk away, that kept the Citicorps and whatnot out of the picture. Is that something that you allege and would expect to prove or not? We believe we will prove at trial that this was a too big to fail environment and that any of the other, we're all compelled to prove the truth of the matter. The government said we're in the real world in this case. The real world is that the government standing there is going to be the lender of last resort, which it was, and the sovereign, which it was. No one was going to step in front of the government, and that's the reality. And we will, in fact, call people to testify or professors of economics to talk about those kinds of, we'll put out a case for that one. Where do we stand on the question, the simple question is, do you contest that the government had not intervened as a lender, that the companies would have gone into liquidation? I really don't know what would have happened, and the problem is I can't know what would have happened. All I can tell you is what did happen, and what you could have predicted what was going to happen. We know what happened to Lehman Brothers. Would the same thing have happened to GM and Chrysler if the government hadn't intervened? No, and the reason I don't think it could have happened is because, and I think we'll prove this to the extent we need to, for economic reasons and for political reasons, it could not have happened. My co-counsel points out to me that four minutes to survive in this environment without being bailed out, but at the end of the day, it's truly a unique set of circumstances. What we believe we're entitled to is under Penn Central, consistent with Judge Hodge's findings, which is let's have a trial, let's develop the facts, and I don't think it's going to take, frankly, it's not going to be that much of a labor, nor I sort of heard a question about, I think, how far afield do we need to go with other creditors and other interested parties. We believe that once we have the basic documents provided by the government to the state department and the documents requested and FOIA requests, we're going to have most of the information we believe we're going to need, probably a few depositions. We're not going to need a lot. I'm assuming that to be the case. We don't think this is going to be... Are you contemplating depositions of decision makers like Mr. Ratner or the Treasury Secretaries? I think a deposition of Mr. Ratner is fairly like that. I'm speculating. I don't think we'd have an interest. I don't think we'd have a need to go, frankly, much beyond that. Mr. Ratner provided and published a book sort of explaining everything he was, at least in his terms, what he was doing. I don't know if the government had pre-publication rights to review and control that publication or not, but we believe and we've cited from it to some degree in our brief. So we believe that Mr. Ratner certainly would be a person who would testify. He's, as I understand, not any longer employed by the government. He's certainly not in a position to trust the government. Is there anything else you want to ask? Do you have any more questions?  Thank you, Mr. Samuel. Thank you. Ginger, this is the last word, but I don't think you need to repeat what we've already heard. I won't, Your Honor. In fact, I'd like to address Judge Toronto's question. So the bankruptcy court in the Chrysler case, it heard 15 witnesses. It got 66 declarations, and it reached a conclusion, Your Honor, if you ask about control. It reached a conclusion, quote, the government entities as lenders are neither controlling the debtors nor new Chrysler and therefore are not on both sides of the sale transaction. Fred, I think I asked you, though, about GM. GM is a much softer finding. It is, but the answer was there was, quote, no evidence, end quote, that GM chose government financing over, quote, over any other alternative because the government told them to do so and that the court found that the government had not become a, quote, insider. So we can look and see when they held. But those were the findings of the court. And specifically, we do assert that there is collateral estoppel on the control issue. The government didn't control the auto manufacturers as we've asserted that that decision should be given collateral estoppel and that the plaintiffs shouldn't be prohibited from trying to show that. And, in fact, the bankruptcy court in Chrysler specifically took testimony about that, that that should resolve the case because then there is no forcing of the government. They're excluding no forcing of the government. The only other thing, Your Honor, is that Chrysler had a choice. The plaintiffs make it sound like Chrysler did not have a choice. And the choice was to take the loan or to pursue bankruptcy and liquidation. And that is a choice, especially because the government did not create the situation that put Chrysler in the position of having to make the choice, try Chrysler's own investments in the financial situation. And in that situation, the government actually just offered a hand and let Chrysler choose. Any more questions? Thank you.